Good morning, ladies and gentlemen. Today, Judge Owens and I are very, very pleased to be joined with the Honorable Fortunato Benavides from the Fifth Circuit Court of Appeals. Pete, thanks so much for coming here and taking time out of your busy schedule to help us out in the Ninth Circuit. With that, we'll start with the cases in the oral argument calendar. The first case is United States v. Moreno. Good morning, Your Honors. I'd like to reserve two minutes for rebuttal. My name is David Eisenberg. I represent Mr. Moreno on appeal. May it please the Court. The principal issue for Mr. Moreno here is whether the rule of joinder under Rule 8 was properly observed. And I think it's important to set the meaning and the requirement of that rule. That rule is a must. It has a must in it. In other words, there must be a showing that two or more defendants participated in the same acts or series of acts or transactions. And that is – brings me to an analysis of what actually happened. There are two counts, two conspiracies. So in other words, what we're looking for are either the same conspiracy, which almost by definition here didn't happen, two different conspiracies. Then we look for the alternative. Is there an indication that Conspiracy No. 1, which is Count 6, is tied in in some way with Conspiracy No. 6, in which Mr. Moreno is involved? The analysis starts then with the idea or the time frame. First conspiracy involving Mr. Borges, I'll call him Ramon or Roman rather, occurred in 2010, and it lasted for just a few days. In 2010, the issue was heroin. In 2010, the common – the people who were involved were Mr. Borges himself, Mr. Padilla, who drops out, and Ms. Shaw, who happens to be a confidential informant, but not at that time. Mr. Moreno wasn't involved. So a period of almost nine months goes by. Nothing happens. One could say there was attenuation. But in any event, that portion of this case was over with. Somewhere around perhaps in the spring of 2011, the FBI turns Ms. Shaw into a confidential informant. Meanwhile, Mr. Borges or Ramon or Roman rather, he has been disciplined by the prison authorities, so in effect he's more or less out of the loop, although there is some kind of connection between he and Ms. Shaw. Nonetheless, now that the FBI is in the case, they are concerned because they want to find a source of supply of not heroin, but something else, methamphetamine. So the new focus here is after they have flipped to the confidential informant, let's see if they can find that source of supply. So the next conspiracy runs between July the 8th of 2011 and August 22 of 2011. And, Your Honors, I'm really going to divide that into two different time sequences because it's important to realize how different this conspiracy was from the earlier one, and therefore they were different. There was no series of transactions of any kind of similar nature. First, on July the 8th, Mr. Kupahia, who was involved in previous contacts with the 2010 matters, Javier, the brother to Mr. Borges, Shaw, the now-in-turn confidential informant, Mr. Flores, who is considered to be a source of supply, and Vince, last name unknown, become involved in this case. At this point in time, Mr. Moreno is not involved. There is no indication that he has been contacted by Mr. Flores at the request of Ms. Shaw, who makes up a story to get Javier involved in this case because Ramon is out of the picture. So he's dropped out. A few days goes by and apparently Flores contacts Vince. Vince apparently is the source of supply because we know that meth showed up. That meth was ultimately confiscated at the post office. There is a break in the action there. The FBI is still concerned, still concerned to find the source of supply. That leads to August the 22nd of 2011. At that time, Ms. Shaw, Flores still, Javier, the brother, are involved. Flores tries to call Vince, according to the testimony that came out at trial. Vince was nowhere to be found. Now, for the first time, Moreno comes into the picture. And on that day, as the record clearly shows, Mr. Moreno was involved in transacting methamphetamine. We don't deny that. Nonetheless, that was a one-day occurrence. And when I say he was involved, I acknowledge the fact that the proof showed that there was involvement of Mr. Moreno. But here's the problem. Since that is attenuated not once, because it's a year later, but twice, because it's the tail end, if you will, of what the government calls conspiracy number two, then there was no commonality. There was no participation, if you will, in these two conspiracies. Hence, there should have been severance. That's not precisely the argument that was made to the district court, was it? No, Your Honor. In fact, I think the argument made to the district court was merely rejoin in the motion for severance. But if the rule is the rule, and certainly defense counsel at that time was relying on that rule, as was counsel for the co-defendant, then it appears that the rule was not waived and the rule was addressed. And even the district court judge recognized that there were two different conspiracies because that's how the government got charged. Sorry, that's how the government charged the case. Interestingly enough, the government seeks to tie this together, that is, the two conspiracies. Isn't that the touchstone here of your argument, that if we assume that there's two different conspiracies, you still have to bridge the hurdle of the connection or the similarity, right? That is part of my argument. Now, Javier seems to be an employee and an underling of his brother who is in the penitentiary, who's in charge, who operates and is the head man. Now, if Javier is a part of both conspiracies and he is working for his brother, what difference does it make that Moreno is even aware of the man in the penitentiary? With due respect, Your Honor, I don't think that Javier was working for his brother the second time around. At that point, Ms. Shaw made up a story because she knew she had to get to Javier because Javier was connected to Flores. So she calls and she says something to the effect, I need to do this one more time because then I'm going to be getting out of the industry, if you will. And that's what led to Javier then coming back onto the scene. But I do not believe that Javier was really working for his brother at that point in time. The government would say the commonality here, besides what Your Honor has just mentioned, is the fact that prison gangs, which I haven't really discussed up until now, is a link and that you have to show the background and the depth of how all this got started in order to get up to Mr. Moreno one year later. Appellant opposes that. First of all, the prison gang issue was terribly divisive, if you will. It was a very bad mark against him with respect to the case. I understand about clarifying instructions and so forth, which the judge did give, but nonetheless, in the atmosphere of the courtroom and the dynamics of a trial, when that cat is out of the bag, it's out of the bag. And limiting instructions being what they are and I respect, I don't believe that that was the way that this case should have gone, obviously. But getting back to the commonality here and the use of all of that background, it really wouldn't have had much of a, let me back up. Had the government merely gone ahead and decided to charge Mr. Moreno separately, they had Ms. Shaw, they had Javier, they had Flores, they had plenty of evidence without the first conspiracy to have been able to carry forward, certainly they would have had a probable cause basis to indict, and they wouldn't have needed anything that had to do with Mr. Borges. Your Honors, I'm going to move to pass the second argument, which is the similar act argument. Down to about a minute. Did you want to reserve? I'm sorry? You're down to about a minute of your time, less than a minute. Okay. Thank you. The forfeiture argument. I would indicate to the Court or say to the Court, the rule is very clear. Rule 32.2 and its subsections, there must be a preliminary order of forfeiture. There must be notice. An indictment is not notice. An indictment is something that the government seeks. The Court is obviously separate from the government. The notice must come from the Court. How was your client prejudiced, Counsel, by the lack of a preliminary order? Because he didn't have an opportunity at the time to contest. Well, didn't he contest it at sentencing? Didn't he file in his sentencing papers in opposition to forfeiture? Well, I believe, Your Honor, that forfeiture contemplates more than a sentencing memo. He was entitled to a hearing, which he did not have. At that hearing, he could have perhaps a little more articulately said, those went, that money was my wife's and partly mine, and here's the proof with respect to it. But he never had the opportunity to do that. So as far as we're concerned, this case is not unlike Shakur. In fact, it's very clear that Shakur really is based very clearly on the parameters of that rule. In Shakur, jury comes back, returns guilty verdicts. The indictment charged some, I forget now, 19 different items to be forfeited. The Eighth Circuit, I believe, in that case went through and looked at the rule and decided that the rule really allowed for, or in fact did, mandate a hearing at which the defendant would have the opportunity to challenge the order of forfeiture. Excuse me. There was no preliminary order of forfeiture, just like in this case there was none. In that case, the defendant was asked through his attorney at the time the jury verdicts came back, do you want a hearing in front of the jury? His attorney at that time waived it and said, we're not going to contest forfeiture. Later on, counsel was fired, if you will, and the defendant, through his own pro se efforts, asked for a preliminary hearing. That's much the situation here. The only difference is at the time of, I believe at the time of sentencing, the defendant himself said something with respect to those casino winnings and that he indicated at least on his own when he allocated to the court, those winnings should be mine, and the winnings were connected to the items that had been secured by the government and sought to be forfeit. Your Honor. You're out of time. Thank you. Thank you. Good morning. May it please the Court. Rachel Hernandez on behalf of the United States. Excuse me. This is a case of overwhelming evidence. The defendant, while under surveillance and as corroborated by phone records, sold over 400 grams of pure methamphetamine. He had $70,000 cash hidden in his closet despite having previously declared bankruptcy, and he possessed two firearms despite his status as a prohibited possessor due to his two drug convictions. Well, how about the con – there's no doubt that there's evidence. Let's talk about the different conspiracies here. What is the – Javier testified at the trial, right? Javier did not testify. Oh, he didn't. Okay. Flores testified and Shaw testified. Okay. But so there was nothing to show that the defendant here was involved in any of those other transactions? That's correct. All right. So what we have is the government wanting to find out who his source is, ostensibly wants to go to the source for the last transaction, which definitely involved the guy in prison and Javier, but he doesn't have anything. So they go to somebody else, and they go to somebody else, and this is the defendant, and he has tons of stuff, bad actor, all that other stuff, overwhelming, like you say. So the government admits then that there's nothing else in the record other than his and Shaw's intermediary to connect him up with the activities that are being controlled and directed by what appears to me to be the main guy who's the gang person who is in prison. Is that correct? Well, I would say this. There were two conspiracies charged, a heroin conspiracy and the methamphetamine conspiracy. Right. The heroin conspiracy involved Shaw and Roman, and the methamphetamine conspiracy was set up by Roman, and I disagree with my colleague as to the timing of that first methamphetamine transaction. That was part of a discussion that Roman and Shaw had had over time, and that first deal and getting in touch with Coupeja, getting Coupeja's phone number, was all orchestrated by Roman. And so that's structured. And Roman is common to both conspiracies. He is. But as to the methamphetamine conspiracy where Mr. Moreno comes in, that was set up by Roman. Roman directed Shaw to use Javier. Javier knew to call Flores. Flores had connections. One was Vince. The next time it was his cousin, Mr. Moreno, from whom he had bought drugs in the past, and Mr. Moreno admitted on the stand he had sold drugs to Flores in the past. And so the first deal with Coupeja set up by Roman, where FBI was aware and FBI took off the drugs before they got to Hawaii, was on July 8th. July 28th, 20 days later, is when the next deal gets set up, and Mr. Moreno is the supplier that day. So you have a conspiracy here where Roman set it up. He set up the structure. He set the price. He told Shaw how much to pay, how much to, excuse me, to charge. And there's nothing to show that anything had changed in those weeks other than FBI was now more involved. But that doesn't change the nature of the conspiracy. And when you look at this, what the case law says is if, in addition to there being great discretion to the district court, if there's going to be the same evidence and if there are sufficient limiting instructions to the jury, the joinder is proper. And here, if there were a separate trial where the government had to just prove the sale, the one sale involving Mr. Moreno, we would have Ms. Shaw on the stand. We would be able to get into how she became an informant, what her knowledge of the drug business is, how did the price come to be set. The price was set by what she learned from Roman as to how much a pound of methamphetamine is. But arguably the gang evidence would not have come in. The gang evidence would not have come in. But there was a limiting instruction that specifically said, specifically, it is not alleged that Ralph Moreno is or was a member of a prison or street gang. Further, it is not alleged that Ralph Moreno participated with others in the prior methamphetamine transactions that preceded the charged indictment in this case. So there was sufficient limiting instruction. I would also point out to the Court that, as was mentioned earlier, there was no argument before the district court that gave the district court any basis to sever Mr. Moreno's charges. He joined with Roman's motion, which said, hey, it's too prejudicial for me, Roman, to be with Mr. Moreno. Secondly, they did not raise the issue of severance again at the close of evidence. They raised it at the close of the government's case, and the case law is clear that that's not sufficient, and on that basis the Court could deem the severance argument waived. Not true. He did, but it is part of the motion for new trial, and we haven't decided whether or not that's sufficient or not. Right? That's correct. Moving on to the discussion of the forfeiture, and I want to correct something that I think was said earlier. The defendant at sentencing, his sentencing memorandum specifically said as to forfeiture, the guns are not mine, they're my son-in-law's, and he has receipts for them, and the money is my wife's, not mine. Well, that's not all he said, though, is it? Excuse me? Didn't he say some of the money is my wife's, and that a certain portion belonged to him, and he explained how he got it. And in other words, when you say he said it wasn't his, he wasn't saying all the money is my wife's. He said it was about $74,000. No, but why do you make these statements that he's – he didn't say that. He said that some of it, a certain amount of it was his wife's. That's true. But didn't he also say that a certain amount of it was his, and it didn't come from drug sales. It came from some other thing that he mentioned of how he got it. And at trial, he testified that there were other explanations for how he got it. However, by the time of sentencing, as to $70,000 of it, he had totally relinquished any claim to that. How so? By saying it wasn't his. I mean, so – But it's a community property state, so that's his argument, is that half of it was his, because half of it – because all of it belonged to his wife, and he was entitled to half. Sure, that is his argument now, and I understand that. And that is the state of the law, clearly, that there is community property. However, filing a pleading then in district court saying none of it – that this isn't mine is disingenuous, I would say, to represent to the court, give this to my wife, it's not mine, and then claim half of it on the back end. Well, I think that was in response to your standing argument. Right. You said he had no standing. And he said, yes, I do. It's a community property state. Counsel, what I'm trying to assess here is that there was an error under Rule 32.2B. So two questions. First, is it the government's obligation to actually move for the preliminary order? I know cases have discussed that, but I look at the text of the rule, and it doesn't – I didn't see anything saying it's the government's requirement to actually move for it. So that's my first question for you. And then second, I'm concerned whether there was prejudice or not. Now, you heard the argument of opposing counsel. I'd like to get your views on the prejudice issue. Yes. I am unaware if there's case law that says it is the government's responsibility, and you're correct, the rule doesn't say that it is. That is typically the practice that the government moves for, the preliminary order forfeiture. As to the prejudice issue, I would say that there is not prejudice. The Shakur case, even, that the defendant cites says that due process is the notice plus procedures to contest the deprivation of property. Again, even at sentencing, the defendant could have said something about his forfeiture, and that was not the case. There's a Fifth Circuit case that the government cited in its briefs that discusses when a defendant – it's Marquez – where a defendant fails to object to deficiencies in the Rule 32.2 procedures that it is reviewed for plain error. And in that case, the court found that there was no plain error, because although clearly the court hadn't followed 32.2, there was error that was plain, but it did not affect substantial rights, because there was no expectation, no proof that the result would have been any different. And that's the same here. There is no prejudice to the defendant, because there is – through the gambling explanations and the car repair explanations, the government proved at trial that those were not valid, that there was no other explanation for that money other than drug proceeds. So whether there had been a preliminary order of forfeiture or not, the result – a timely one, I should say – the result would have been the same. I'm trying to see if there's a difference between a trial – I guess you're trying to show that all that money is typical of a drug dealer. He would have money around, right? The issue there isn't whether his wife – whether it's his wife's money, but you have a separate proceeding going on for that, don't you? Is there a civil proceeding also in this case going on? There was a civil proceeding. It was dismissed by the magistrate judge. An appeal was taken and stayed pending this case. What do you mean? It was – the government's request was dismissed, or the lady's request for return of the money was – the government's forfeiture proceeding for that money was dismissed? Yes. Okay. So the money's still in play. It hasn't been returned to the lady. Correct. What do we do with the problem that all of this occurred after the notice of appeal was filed, or much of it? That the Rule 32? Yeah. Well, there are cases – the Martin case from the Fourth Circuit says, although missing the 32.2 deadline does not deprive the district court of jurisdiction to enter orders of forfeiture as long as the sentencing court made the forfeiture clear. That's a Fourth Circuit case, and I would say that that applies here. Again, the point of the preliminary order of forfeiture is to allow third parties to have notice of the pending forfeiture. So while I would agree it should have been done in the order laid out in 32.2, the fact that it was done later at least gave third parties notice and provided them an opportunity to be heard on that. Well, he had notice right from the – I thought the indictment – wasn't there a request for forfeiture in the indictment? Yes, there was, and he had notice. He had notice. He absolutely had notice. Now, the statute contemplates that this hearing is going to occur after this preliminary order and that this hearing and the findings are going to be made prior to the time of sentencing. And here we didn't have the preliminary order, right? The preliminary order was after sentencing. Right. So your case that you said it was not – it was plain error. From the Fifth Circuit, yes. And plain error didn't apply. Yeah. The defendant there didn't ask for a hearing like this case? I mean, he may have made some mention of it, but he didn't before sentencing ask for a hearing on his forfeiture. That's correct. He also wasn't advised, was he, that there would be a forfeiture determination at that – at the sentencing, was he? In the Fifth Circuit case? In this case. In this case. He was advised at sentencing. The court – it was part of the court's ruling and judgment and conviction that that was part of the sentence and – Brought it up. Then all of that would have been brought to the attention of the court, and that could have been delayed and you could have had a hearing, I guess. Yes. And in Martin, there was a preliminary order, true? In Martin, there was a preliminary order, but other 32.2 deadlines were missed. Right. Okay. Thank you very much for your argument. You used up your time on the first go-around, but I'll give you one minute for rebuttal, okay? Thank you. With respect to the severance issue, I believe the evidence showed that when Ms. Shaw was on the witness stand, she said, with respect to the 2011 occurrence in July, I don't remember if I called Roman or not. And then she went on to say, so I made up a story. And the story was, I'm going to reach out for you, Javier, because I'm trying – I need one more deal, I'm going to get out of the business. So there was that break, there was that attenuation. With respect to the counsel's request for severance, whether it was waived or not, on day six of the trial, counsel stated to the court, this case should have been chopped in half, and I mean attorney from my client, and Mr. Bárquez should have gone to trial on the case he has and we should have gone to trial on the case that we have. So I believe that it was raised. And then finally, Your Honors, with respect to what Mr. Moreno said at sentencing, this goes to the issue of whether he wanted to raise forfeiture, it's a little bit difficult to understand it in the context, but the quote has to do with him saying he has an issue about privacy being invaded, but then he says, and he refers to things that he felt were private, bank statements, phone records, casino winnings or losses, whatever I had. And the theory here is the bulk of the $73,000 was casino winnings and some settlement from, I think, an accident that his wife had. Thank you. Thank you, counsel. The case is heard and will be submitted for decision.
judges: Thomas, Benavides, Owens